IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| Enoch Brown, ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | 1:21cv703 (AJT/JFA) |
| ) | |
| Kevin Talley, *et al.*, ) | |
|     Defendants. ) | |

## MEMORANDUM OPINION

Plaintiff, a Virginia inmate, submitted this *pro se* action to redress alleged violations of his constitutional rights. [Dkt. No. 1]. This matter is before the Court on Defendant Colonel Larry Leabough's ("Colonel Leabough") Motion for Summary Judgment. [Dkt. No. 20]. For the reasons explained below, Colonel Leabough's motion will be granted.

### I. Relevant Background and Procedural History

By Order entered on October 19, 2021, the Court, *inter alia*, screened Plaintiff's Complaint pursuant to 28 U.S.C. § 1915A. [Dkt. No. 8]. In its screening Order, the Court concluded that the initial Complaint stated a due process claim against Colonel Leabough but dismissed Plaintiff's claims against two other Defendants. [*Id.*] The Court provided Plaintiff an opportunity to file an amended complaint to resurrect the dismissed claims. [*See id.*]. Thereafter, Plaintiff filed an Amended Complaint; however, by Order entered on January 5, 2022, the Court determined that Plaintiff's Amended Complaint did not state a claim for relief against any Defendant. [Dkt. No. 13 at 1]. Accordingly, the Court dismissed the Amended Complaint but permitted the due process claim against Colonel Leabough in the original Complaint to proceed and directed service on Colonel Leabough. [*See id.* at 1, 4].[1]

---

[1] The Court also noted in its January 5, 2022 Order that the posture of this case is somewhat

Colonel Leabough filed his Motion for Summary Judgment on March 9, 2022, which includes a proper notice pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of his right to respond to the motion within twenty-one days. [Dkt. No. 20]. Plaintiff has not filed a Response in Opposition and the time to do so has lapsed. The Court has reviewed and considered Plaintiff's Complaint as well as Colonel Leabough's Motion for Summary Judgment and Memorandum in Support, including all of the attached declarations and exhibits. Colonel Leabough's Motion for Summary Judgment is ripe for adjudication.

## II. Overview of the Parties

Plaintiff is a pretrial detainee who is incarcerated at Riverside Regional Jail ("RRJ") in North Prince George, Virginia. [Dkt. No. 1 at 1, 6]. Colonel Leabough is the Superintendent of RRJ and has served in that capacity since July 2020. Leabough Decl. at 1, [Dkt. No. 21-7 at 1–3].

## III. Factual Background

### A. Plaintiff's Allegations[2]

Plaintiff claims that when he arrived at RRJ on March 4, 2021, he was placed in "solitary confinement" at Colonel Leabough's direction and pursuant to Colonel Leabough's "SHU Life" policy, which allegedly mandates that an inmate who assaults a staff member is required to remain

---

unusual "given that an amended complaint typically supersedes a previously filed complaint." [Dkt. No. 13 at 1 n.1]. As the Court previously explained, however, because none of the claims in the Amended Complaint survived the screening requirements of § 1915A, the Court, in deference to Plaintiff's *pro se* status, determined that the due process claim against Colonel Leabough in the initial Complaint would be permitted to go forward, and that the initial Complaint, [Dkt. No. 1], would be the operative Complaint in this action. [*See id.*].

[2] Plaintiff's Complaint is not verified or sworn to under penalty of perjury. [Dkt. No. 1 at 1–6]. Thus, Plaintiff's Complaint is not admissible evidence and will not be considered in the Court's analysis of the Colonel Leabough's Motion for Summary Judgment. *See McClellan v. Lewis*, No. 3:08cv260, 2009 WL 2434141, at *2 (E.D. Va. Aug. 6, 2009) (explaining that an "unsworn complaint . . . is not competent summary judgment evidence"). However, the Court summarizes the relevant allegations of Plaintiff's Complaint herein to provide additional background of the basis for Plaintiff's claims. The Court also corrects the spelling, capitalization, and grammatical errors in the references to Plaintiff's Complaint.

2

in solitary confinement for the duration of his incarceration at RRJ. [Dkt. No. 1 at 5]. Plaintiff further claims that he was placed in "solitary confinement without a charge, or any periodic reviews" in violation of his Eighth and Fourteenth Amendment rights.[3] [*Id.*].

### B. Evidence Regarding RRJ's Housing Classification System

Inmates at RRJ are housed in accordance with an administrative classification system that balances a number of factors, including "the seriousness of the [inmate's] current charges, any prior criminal offenses or escape attempts, and the inmate's institutional disciplinary history." [Dkt. No. 21 at 2] (citing Mack Decl. ¶ 3, [Dkt. No. 21-6 at 1–5]). Under this system, inmates may be housed in general population or in "alternative housing areas, including maximum security custody, protective custody, or the mental health pod." Mack Decl. ¶ 3; Leabough Decl. ¶ 3, [Dkt. No. 21-7 at 1–3]. Assignments to housing areas are "made to ensure the safety of other inmates, RRJ staff, and the inmate himself." Mack Decl. ¶ 3.

The Restrictive Housing Unit ("RHU") is a specialized housing unit for inmates who cannot be housed in general population due to safety or other concerns. *Id.* ¶ 5. The RHU houses various classifications of inmates, including: (i) "those in restricted confinement," also known as "administrative detention"; (ii) "those in disciplinary detention"; and (iii) "those in pre-hearing detention awaiting resolution of a disciplinary charge." *Id.*

Inmates who are housed in restricted confinement/administrative detention, are placed there on the basis of an "administrative decision primarily to address security concerns." *Id.* ¶ 7. In determining whether an inmate should be placed in administrative detention, RRJ staff evaluate several factors, such as "the inmate's history of disciplinary violations, possession of contraband,

---

[3] The Court notes that Plaintiff submitted a letter dated August 17, 2022, in which Plaintiff alleges that Colonel Leabough violated the terms of a May 23, 2002 "Behavior Contract" with Plaintiff. [Dkt No. 23]. To the extent that Plaintiff seeks to amend his Complaint to include this claim, such request is denied. Plaintiff is advised that, should he choose to do so, he may pursue this claim in a separate civil action.

3

[and] assaultive conduct, or other incidents that threaten security." *Id.* A "Restrictive Housing Review Committee meets weekly to review each inmate housed in restricted confinement in the RHU to consider whether an inmate can be moved back into the general population, or whether he should be allowed additional privileges or fewer restrictions." *Id.* The conditions of confinement for inmates housed in administrative detention "vary based on the security interests" that caused the inmate to be placed there. RRJ policy directs that classification personnel meet with inmates during this review process and any inmate who is dissatisfied with the Committee's determinations may appeal. [*See* Dkt. No. 21-7 at 12] (RRJ restrictive housing policy stating that "[c]lassification personnel will meet with the inmate" during the review process); *see also*, Spratley Decl. ¶ 3, [Dkt. No. 21-1] (noting that inmates "may appeal a [c]lassification or housing assignment"); Mack Decl. ¶ 7 (noting that inmates may appeal an assignment to restricted confinement).

Inmates are placed in disciplinary detention if they are found to have violated disciplinary policies. *See* Mack Decl. ¶ 4. An inmate who is charged with a disciplinary infraction will be provided "notice of the charge, the opportunity to be heard and call witnesses, and a written explanation of the hearing officer's findings." *Id.* Inmates who are held in disciplinary detention are subject to lockdown conditions but still have access to recreation, showers, and other necessities. *Id.* ¶ 6.

### C. Evidence Regarding Plaintiff's Custody Status

Plaintiff was booked into RRJ on March 4, 2021, and RRJ classification officials determined that he should be placed in administrative detention due to safety concerns for other inmates and staff. *See id.* ¶ 9. The decision to place Plaintiff in administrative detention stemmed, in part, from a violent altercation during Plaintiff's prior incarceration at RRJ in April of 2020. *Id.* During that incident, Plaintiff assaulted multiple RRJ staff members, including beating "one officer with a closed fist with sufficient force to break [the officer's] orbital socket." *Id.* Plaintiff's

initial custody determination was also based in part on the serious nature of his pending criminal charges, including second degree murder. *See* Initial Custody Classification Form, [Dkt. No. 21-5 at 17] (scoring numerous factors in determining Plaintiff's initial custody level, including his pending criminal charges).

Shortly after his placement in administrative detention, Plaintiff was charged with a disciplinary infraction for making threatening statements and causing a security disturbance. Mack Decl. ¶ 9. Plaintiff was found guilty of this disciplinary charge following a hearing and he received thirty days of disciplinary detention. [*See* Dkt. No. 21-4 at 34–38]. Upon completion of Plaintiff's disciplinary detention, the Restrictive Housing Review Committee determined that Plaintiff should remain in administrative detention. Mack Decl. ¶ 10. The Committee based its decision on the seriousness of Plaintiff's pending criminal charges as well as "his lengthy history of disciplinary infractions and assaultive behavior while incarcerated, and his threatening comments to staff." *Id.* The Restrictive Housing Review Committee regularly reviewed Plaintiff's housing status, with the first review having been conducted on April 13, 2021. *See id.*; Restrictive Housing Rev. Form, [Dkt. No. 21-5 at 36]. Plaintiff received another disciplinary charge on May 16, 2021, for threatening staff, refusing to follow orders, and creating a security disturbance, though it is not clear from the record what penalty Plaintiff received for this infraction. Mack Decl. ¶ 9; Misconduct Rpt., [Dkt. No. 21-4 at 28–29].

Plaintiff remained in the RHU until July 2, 2021, and because he "committed a number of additional disciplinary infractions during this time period, [Plaintiff's] status alternated between disciplinary detention and [administrative detention] with varying levels of privileges." [Dkt. No. 21 at 5] (citing Restrictive Housing Rev. Forms, [Dkt. No. 21-5 at 32–36]). During those periods when Plaintiff was held in administrative detention, the Restrictive Housing Review Committee conducted periodic reviews of his housing status. [*Id.*] (noting that the Committee

reviewed Plaintiff's housing status on May 26, June 8, June 15, and June 29, 2021).

Plaintiff was reassigned to the RHU's least restrictive unit—the "step down" unit—on July 2, 2021, where Plaintiff was held under the same conditions as general population inmates. [*Id.*]. On July 9, 2021, Plaintiff was reassigned to the mental health pod, where he remained until August 7, 2021. [*Id.*]; *see* Mack Decl. ¶ 11. Plaintiff's behavior in the mental health pod resulted in him being sent back to the RHU step down unit on August 7, 2021. [Dkt. No. 21 at 5] (noting that Plaintiff was removed from the mental health pod after "attempting to start fights with other inmates"). Thereafter, Plaintiff "alternated between the step down unit, restrictive custody with varying levels of privileges, and disciplinary detention until October 14, 2021" when he was assigned to the medical unit. [*Id.* at 6.] (noting that on various occasions, Plaintiff refused to comply with orders, failed to lockdown, and threatened to murder staff). Plaintiff was released from the medical unit on December 5, 2021; however, due to his continued violent behavior, Plaintiff was returned to the RHU in administrative detention status. [*Id.*] (noting that following his return to administrative detention, the Restrictive Housing Committee reviewed Plaintiff's status on a weekly basis).

## IV. Summary Judgment Standard

Summary judgment is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine dispute "as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see* Fed. R. Civ. P. 56(a); *Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*, 377 F.3d 408, 418 (4th Cir. 2004). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party . . . [and] [a] fact is material if it might affect the outcome of the suit under the governing law." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (citations omitted). The moving party has the initial

6

burden to show the absence of an essential element of the nonmoving party's case and to demonstrate that the moving party is entitled to judgment as a matter of law. *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 185 (4th Cir. 2004); *McLean v. Patten Cmtys., Inc.*, 332 F.3d 714, 718 (4th Cir. 2003); *see Celotex*, 477 U.S. at 322–25.

When the moving party has met its burden to show that the evidence is insufficient to support the nonmoving party's case, the burden then shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Honor*, 383 F.3d at 185; *McLean*, 332 F.3d at 718–19. Such facts must be presented in the form of exhibits and sworn affidavits. *Celotex*, 477 U.S. at 324; *see M&M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 163 (4th Cir. 1993). To successfully defeat a motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, "mere speculation," the "building of one inference upon another," the "mere existence of a scintilla of evidence," or the appearance of "some metaphysical doubt" concerning a material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002); *Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 330 F. Supp. 2d 668, 671 (E.D. Va. 2004). Rather, there must be sufficient evidence that would enable a reasonable factfinder to return a verdict for the nonmoving party. *See Anderson*, 477 U.S. at 252.

Although the Court is not "to weigh the evidence and determine the truth of the matter" at the summary judgment phase, the Court is required to "determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson*, 477 U.S. at 249); *see Jacobs*, 780 F.3d at 568–69. In determining whether there is a genuine issue for trial, "[t]he relevant inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Stewart v.*

7

*MTR Gaming Grp., Inc.*, 581 F. App'x 245, 247 (4th Cir. 2014) (quoting *Anderson*, 477 U.S. at 251–52).

## V. <u>Analysis</u>

As summarized above, Plaintiff claims that upon Plaintiff's arrival at RRJ on March 4, 2021, Colonel Leabough placed Plaintiff in "solitary confinement without a charge or any periodic reviews" in violation of Plaintiff's Eighth and Fourteenth Amendment rights. [Dkt. No. 1 at 5]. Plaintiff alleges that he was placed in segregation because Colonel Leabough had a "SHU Life" policy, under which any inmate who had previously assaulted a staff member would be required to stay in solitary confinement for the duration of his incarceration at RRJ. [*See id.*]. Colonel Leabough moves for summary judgment, *inter alia*, on the grounds that Plaintiff's claims lack merit.[4] [*See* Dkt. No. 21 at 2].

As an initial matter, the Court notes that Plaintiff is a pretrial detainee, not a convicted prisoner. [*See id.*]. Thus, Plaintiff's claim arises under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment's prohibition on cruel and unusual punishment. *See Slade v. Hampton Roads Reg'l Jail*, 407 F.3d 243, 250 (4th Cir. 2005); *see also Williamson v. Stirling*, 912 F.3d 154, 173 (4th Cir. 2018) (noting that the Fourteenth Amendment's Due Process clause "protects . . . detainees from punishment 'prior to an adjudication of guilt in accordance with due process of law'" (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979))).

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

---

[4] Colonel Leabough also moves for summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies. [Dkt. No. 21 at 9–10]. Although Plaintiff appears to allege in his Complaint that a jail official refused to provide Plaintiff with grievance forms, he has not filed any response to Colonel Leabough's summary judgment motion. [*See* Dkt. No. 1 at 3]. That said, however, the record before the Court is not sufficient for the Court to determine whether a genuine issue of material fact exists as to the exhaustion issue.

With respect to pretrial detainees, "[d]ue process requires that a pretrial detainee not be punished." *Bell*, 441 U.S. at 535 n.16; *see Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988). However, "not every inconvenience encountered during pretrial detention amounts to 'punishment' in the constitutional sense." *Martin*, 849 F.2d at 870 (citation omitted).

Where a pretrial detainee seeks to challenge individually-imposed restrictions, such a claim implicates procedural due process protections. *See Williamson*, 912 F.3d at 174. "In some circumstances, however, the treatment of a pretrial detainee can be so disproportionate, gratuitous, or arbitrary that it becomes categorically prohibited punishment that will sustain a substantive due process claim." *Id.* at 175. The Court construes Plaintiff's Complaint to raise both substantive and procedural due process claims and will address each claim in turn.

### A. Substantive Due Process

"Typically, a substantive due process claim pursued by a pretrial detainee challenges the general conditions of confinement or the treatment of all detainees in a specific facility." *Id.* at 174 (citing *Slade*, 407 F.3d at 251). To establish a substantive due process claim, a plaintiff must show "the challenged conditions were either (1) imposed with an express intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective, in which case an intent to punish may be inferred." *Id.* "[A]bsent an explicit intention to punish a pretrial detainee, [courts] must evaluate the evidence and ascertain the relationship between the actions taken against the detainee and the custodian's supporting rationale." *Id.* (citation omitted). Further, "[i]n evaluating whether there is an intent to punish, a court may not simply accept the defendant's justification for placing a detainee in administrative segregation but must 'meaningfully consider whether the conditions of confinement were reasonably related to the stated objective, or whether they were excessive in relation thereto.'" *Tate v. Parks*, 791 F. App'x 387, 390 (4th Cir. 2019) (citing *Williamson*, 912 F.3d at 178). In other words, this "inquiry turns on whether the actions taken may

9

validly be attributed to an alternative, nonpunitive rationale, and whether they appear 'excessive in relation to the alternative purpose assigned.'" *Williamson*, 912 F.3d at 178 (quoting *Robles v. Prince George's Cnty, Md.*, 302 F.3d 262, 269 (4th Cir. 2002)).

To the extent that Plaintiff intends to allege that his placement in the RHU stemmed from an intent to punish him, the Court finds such contention unavailing. Here, the record evidence establishes that Plaintiff's initial placement in the RHU was based upon a wholly non-punitive objective—to protect other inmates and jail staff from Plaintiff's violent tendencies. Classification officials' determination that Plaintiff's history of violent interactions with jail staff—including beating one jail official so severely that the official suffered a broken orbital socket—warranted his initial placement in the RHU.

Further, Colonel Leabough avers that, although he was not personally involved in Plaintiff's initial housing assignment, "there is no 'SHU Life' policy" at RRJ that mandates that inmates who previously assaulted a staff member be permanently assigned to the RHU. Leabough Decl. ¶¶ 4–5. The evidence in the record supports Colonel Leabough's assertion. The record establishes that all housing decisions are based upon numerous non-punitive, individualized factors, and Plaintiff has failed to produce any conflicting evidence that would support the allegations in his Complaint. In addition, the record shows that after Plaintiff was placed in the RHU, he continued to engage in the same type of behavior that jail officials determined warranted his initial segregation.

For instance, shortly after he was placed in the RHU, Plaintiff was involved in an incident where he had to be restrained after he threatened staff and refused to submit to a court-ordered DNA sample. *See* Incident Rpt., [Dkt. No. 21-4 at 39]. Less than ten days later, Plaintiff received an infraction for making threats and causing a security disturbance. *See* Misconduct Rpt., [Dkt. No. 21-4 at 35]. During that incident, Plaintiff refused several commands to lock down in his cell,

10

approached an officer "in a fighting stance" threatening to "beat [the officer's] ass," and blocked the officer's attempts to close the cell block door. *Id.* During yet another incident, in which Plaintiff was angry over not receiving his dinner tray, Plaintiff threatened to "hurt staff" if he did not quickly receive his dinner and stated to an officer: "you know about me and know I have no problem coming at staff." *See* Misconduct Rpt., [Dkt. No. 21-4 at 28]. Plaintiff then kicked his cell door open and began to approach the officer with his fists clenched refusing commands to return to his cell. *See id.* It was necessary for officers to use pepper spray in order to subdue Plaintiff. *See id.* In short, all of the evidence in the record demonstrates that Plaintiff's placement in the RHU—whether in disciplinary detention or administrative segregation—was reasonably related to preventing Plaintiff from engaging in behavior that threatened jail security and jeopardized the safety of others.

The Court recognizes that there is some evidence in the record from which the Court could infer that the conditions of Plaintiff's confinement were sometimes harsh (although Plaintiff himself does not allege this in his Complaint or in any response to the summary judgment motion). *See* Mack Decl. ¶ 6. The Court also notes, however, that even during Plaintiff's relatively brief stints in disciplinary segregation, where he was subjected to the harshest conditions, Plaintiff still had regular access to the recreation yard and shower facilities, as well as access to the telephone for emergencies and legal calls, and access to attorney visitation. *See id.* ¶¶ 6, 9–12. In addition, during those periods when Plaintiff was in administrative detention, he had the opportunity to earn privileges and to have his custody status relaxed. *See id.* ¶ 10. Indeed, Plaintiff did earn the ability to be housed in less restrictive settings such as the step down unit, but he consistently failed to maintain good behavior and was placed back into more restrictive settings. *Id.* ¶ 11. Given Plaintiff's penchant to not only threaten violence, but to repeatedly act upon his threats, the Court can find no evidence to establish that the conditions of Plaintiff's confinement were excessive in

11

relation to the stated purpose of maintaining the safety and security of the jail.

In sum, having thoroughly reviewed the proffered justification for Plaintiff's placement in administrative segregation, the Court concludes that the conditions of Plaintiff's confinement were reasonably related to the stated objective of ensuring the safety of other inmates and staff at RRJ, and that the imposed conditions were not excessive in relation to that objective. Thus, for these reasons, the Court finds that the record lacks sufficient evidence to allow a reasonable factfinder to conclude that Colonel Leabough violated Plaintiff's substantive due process rights.

### B. Procedural Due Process

"A pretrial detainee challenging individually-imposed restrictions—as opposed to shared conditions of confinement—is entitled to pursue a procedural due process claim." *Williamson*, 912 F.3d at 174 (quoting *Dilworth v. Adams*, 841 F.3d 246, 250–52 (4th Cir. 2016)). "[P]retrial detainees have not been convicted of the crimes with which they are charged," and "[f]or that reason, the [United States] Supreme Court held in *Bell v. Wolfish*, [that] they retain a liberty interest in freedom from 'punishment,' even while they are detained to ensure their presence at trial." *Dilworth*, 841 F.3d at 251 (quoting *Bell*, 441 U.S. at 535–37). Therefore, "although jail officials are entitled to place restrictions on pretrial detainees for misconduct committed during their detention, those regulatory types of discipline nevertheless intrude on the detainee's liberty interest in remaining free from punishment," and "a pretrial detainee may not be disciplined in the absence of some level of due process." *Williamson*, 912 F.3d at 182 (citing *Bell*, 441 U.S. at 535; *Dilworth*, 841 F.3d at 251).

"The level of procedural due process to which a pretrial detainee is entitled in a particular situation . . . var[ies] according to whether a restriction was imposed for disciplinary or administrative purposes." *Id.* at 175. Restrictions imposed for disciplinary reasons, i.e, misconduct, entitle the detainee to "notice of the alleged misconduct, a hearing, and a written explanation of

the resulting decision." *Id.* If, however, restrictions are imposed for administrative reasons, i.e., "managerial and security needs," the detainee is entitled only to a diminished level of process. *See id.* (noting that "the courts of appeals have generally concluded that *some* level of process must be afforded to the pretrial detainee, even if the process is provided after the restriction has been imposed") (emphasis added). Specifically, a pretrial detainee who is subjected to administrative restrictions is entitled to be informed of the reasons for the decision and to have an opportunity to be heard on the matter within a reasonable time. *Id.* at 176–77. In addition, pretrial detainees are also entitled to periodic review of their confinement "to ensure that administrative segregation is not 'used as a pretext for indefinite confinement,'" and such reviews "must be meaningful enough to take into account the 'facts relating to a particular prisoner.'" *Id.* at 183 (quoting *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983)).

Here, Colonel Leabough argues that Plaintiff has failed to establish a procedural due process violation. [Dkt. No. 21 at 15]. Upon review, the Court agrees. Although Plaintiff alleges that he was "placed in solitary confinement without a charge or any periodic reviews," he offers no evidence in support of this claim and the Court can find none in the record. To the contrary, the record plainly establishes that Plaintiff received all of the process to which he was entitled.

During his time in the RHU, Plaintiff was subject to both disciplinary detention and administrative segregation. As explained above, with respect to Plaintiff's various stints in disciplinary detention, Plaintiff was entitled to notice, a hearing, and written notice of the decision. *Williamson*, 912 F.3d at 175. The evidence in the record clearly shows that jail officials complied with these requirements in every instance in which Plaintiff received a sanction of disciplinary detention. *See e.g.,* Notices Disciplinary Hr'g [Dkt. No. 21-4 at 5, 11, 14, 24, 27, 34].

Regarding Plaintiff's confinement in administrative detention, the Court has determined that this housing assignment was imposed for valid administrative purposes and not with the intent

13

to punish Plaintiff. *See supra* Part V.A. Thus, Plaintiff was entitled to "[t]he opportunity to present his views" about his administrative segregation "within a reasonable time" after the detention began and periodic reviews of his detention that were "meaningful enough" to account for the facts relating to Plaintiff. *Williamson*, 912 F.3d at 183 (citing *Hewitt*, 459 U.S. at 477).

The record reflects that RRJ's Restrictive Housing Review Committee reviewed Plaintiff's housing status on a regular basis.[5] *See* Restrictive Housing Rev. Forms, [Dkt. No. 21-5 at 20–37]; Inmate Activity Rev. Rpt., [Dkt. No. 21-5 at 1–5]. The record also shows that the Committee considered Plaintiff's particular circumstances at each review, including his mental health, and that the Committee granted Plaintiff additional privileges or adjusted his housing status if his behavior warranted such a change. *See* Restrictive Housing Rev. Forms, [Dkt. No. 21-5 at 20–37]; Mack Decl. ¶ 12 (noting that the Restrictive Housing Review Committee includes a mental health professional who reviewed Plaintiff's mental health situation during each review). Furthermore, Plaintiff was provided an opportunity to present his views as well as to appeal any decision with which he did not agree. [*See* Dkt. No. 21-7 at 12] (RRJ restrictive housing policy stating that "[c]lassification personnel will meet with the inmate" during the review process); *see also*, Spratley Decl. ¶ 3, (noting that inmates "may appeal a [c]lassification or housing assignment" via kiosk or by submitting the request to the Classification Lieutenant); Mack Decl. ¶ 7 (noting that inmates may appeal an assignment to restricted confinement).

---

[5] Despite RRJ's policy of reviewing the status of such inmates every seven days, the Court can find no indication in the record that Plaintiff's status was reviewed in the two weeks between Plaintiff's arrival at RRJ on March 4, 2021, and his placement in disciplinary detention on March 18, 2021. Jail officials' failure to abide by internal policies, however, is insufficient to sustain a due process claim. *See Pegram v. Williamson*, No. 1:18cv828, 2022 WL 541495, at *25 (M.D.N.C. Feb. 23, 2022) (recognizing that "'[t]he state is required to abide by minimum procedural due process requirements' . . . but not necessarily its own procedures, 'when it places an inmate in administrative segregation'" (quoting *Massey v. Singleton*, 979 F.2d 848 (4th Cir. 1992) (unpublished table decision))).

Accordingly, the Court finds that the record lacks sufficient evidence to allow a reasonable factfinder to conclude that Colonel Leabough violated Plaintiff's procedural due process rights.

## VI. Conclusion

For the foregoing reasons, Colonel Leabough's Motion for Summary Judgment will be granted. An appropriate order shall issue.

Entered this __23__ day of __JAN.__ 2023.

Alexandria, Virginia

_____
/s/
Anthony J. Trenga
Senior United States District Judge